# THE STATE OF NEW HAMPSHIRE

# SUPREME COURT



**In Case No. 2018-0483, <u>Christina DePamphilis v. Paul Maravelias</u>, the court on January 16, 2019, issued the following order:**

The plaintiff's motions to strike exhibits to the defendant's brief and reply brief are granted in part and denied in part.  Pages 197 to 221 of the appendix to the defendant's brief and pages 1 to 23 of the appendix to the defendant's reply brief are stricken because they consist of pleadings and documents that were not submitted to the trial court in connection with the decisions that are the subject matter of the present appeal, but were instead submitted in related matters.  <u>See</u> <u>Sup. Ct. R.</u> 13(1).  The remaining relief requested by the plaintiff in both motions is denied.

Having considered the briefs and those portions of the record that are properly before us, we conclude that oral argument is unnecessary in this case.  <u>See</u> <u>Sup. Ct. R.</u> 18(1).  We affirm.

The defendant, Paul Maravelias, appeals orders of the Circuit Court (<u>Coughlin</u>, J.), following a three-day evidentiary hearing, extending a civil stalking final order of protection in favor of the plaintiff, Christina DePamphilis, for one year, <u>see</u> RSA 633:3-a, III-c (Supp. 2018), and modifying the order's terms.  He argues that: (1) RSA 633:3-a, III-c is unconstitutional, both facially and as applied; (2) the decision to extend the protective order was unsupported by the evidence and an unsustainable exercise of discretion; (3) the trial court allegedly violated due process by not timely holding the hearing under RSA 633:3-a, III-c, not permitting him to record video of the plaintiff during her testimony, allowing the plaintiff to introduce certain photographs into evidence, and allegedly "ignoring" his motion to dismiss; (4) the trial court was biased against him; and (5) the trial court erred by modifying the protective order.

We address first the defendant's argument that the trial court failed to timely holding the hearing.  We note that, beyond his offhand reference to due process, the defendant has not developed a due process argument with respect to the timeliness of the hearing under RSA 633:3-a, III-c.  Accordingly, any such argument is waived.  <u>See</u> <u>State v. Blackmer</u>, 149 N.H. 47, 49 (2003).

RSA 633:3-a, III-c provides a defendant with the right to a "hearing on the extension" of a protective order "to be held within 30 days of the extension." The record reflects that the plaintiff moved to extend the protective order on January 5, 2018, that the trial court extended the protective order on January

12, 2018, and that, following the defendant's objection, the court scheduled a hearing for February 15, 2018.  According to the plaintiff, however, that hearing did not go forward on the motion to extend, but instead went forward, without objection, on a separate stalking petition that the defendant had brought against the plaintiff's father, David DePamphilis (DePamphilis).  The defendant asserts that he was not offered an opportunity to commence the hearing on the motion to extend until February 20, 2018, an offer that he apparently declined.  The hearing ultimately went forward over the course of three days, May 3, May 4, and June 8, 2018, and the trial court granted the motion to extend on June 15, 2018.  The defendant first raised his timeliness objection in a motion for reconsideration filed on June 25, 2018.

When the legislature has mandated a time limit for the holding of a hearing "out of liberty interest concerns," "personal jurisdiction over a defendant is lost, <u>absent waiver</u>, if the case is not heard within the statutory period."  <u>McCarthy v. Wheeler</u>, 152 N.H. 643, 645 (2005) (emphasis added).  In <u>McCarthy</u>, we held that a trial court's failure to comply with the time limits for temporary and final domestic violence protective order hearings required dismissal of any temporary orders issued and of the petition, unless the defendant was responsible for the delays.  <u>Id</u>. at 646.  The defendant argues that, because the hearing in this case was not held within thirty days of January 12, 2018, the trial court necessarily lacked personal jurisdiction over him, and he is now entitled to have the protective order vacated.

It is well established, however, that by participating in the merits of a proceeding without first objecting to the trial court's lack of personal jurisdiction, a defendant consents, and thereby waives any objection, to the court's exercise of personal jurisdiction.  <u>Compare</u> <u>Estate of Lunt v. Gaylor</u>, 150 N.H. 96, 97-98 (2003) (defendant's motion to strike default based solely on defective service of process did not address merits of the case so as to constitute a waiver of personal jurisdiction), <u>with</u> <u>Beggs v. Reading Company</u>, 103 N.H. 156, 158 (1961) (defendant waived challenge to personal jurisdiction by failing to timely move to dismiss and by participating in hearings relating to merits of the case).  Unlike the defendant in <u>McCarthy</u>, who moved to dismiss the domestic violence petition at the hearing due to the trial court's failure to timely hold it, see <u>McCarthy</u>, 152 N.H. at 644, the defendant here fully participated in a merits hearing lasting three days and resulting in a transcript nearly 500 pages in length, without once objecting on timeliness grounds.  Under these circumstances, even if we were to assume that a failure to timely hold the hearing under RSA 633:3-a, III-c results in the loss of personal jurisdiction, the defendant's participation in the hearing, without objecting on timeliness grounds, amounted to his voluntary submission to the trial court's jurisdiction and, thus, to the waiver of the timeliness requirement.

We next address the defendant's challenges to the merits of the trial court's decision to extend the protective order.  The trial court has discretion to

2

extend a civil stalking final order of protection, initially for one year and thereafter for periods of up to five years, if it finds "good cause" for the requested extension. RSA 633:3-a, III-c; see MacPherson v. Weiner, 158 N.H. 6, 9 (2008). In ruling on a motion to extend a protective order, the trial court is required to "review the [protective] order, and each renewal thereof and . . . [to] grant such relief as may be necessary to provide for the safety and well-being of the plaintiff." RSA 633:3-a, III-c.

In MacPherson, we construed RSA 633:3-a, III-c to mean that "whether 'good cause' exists directly relates to the safety and well-being of the plaintiff." MacPherson, 158 N.H. at 10. "Good cause" exists to extend a protective order, we held, if "the trial court determines that the circumstances are such that, without a protective order, the plaintiff's safety and well-being would be in jeopardy." Id. In applying this standard, the trial court is required to assess whether the current conditions are such that there is still concern for the safety and well-being of the plaintiff, and in so doing, to review the circumstances of the original petition and any violation of the protective order, taking into account any present and reasonable fear by the plaintiff. Id.

"The trial court is in the best position to view the current circumstances, as well as the defendant's prior acts, and determine whether an extension is necessary for the safety and well-being of the plaintiff." Id. at 11. We will uphold the trial court's findings and rulings unless they lack evidentiary support or are tainted by error of law, id. at 10, mindful that it is for the trial court to accept or reject, in whole or in part, whatever evidence was presented, and that our role is not to determine whether we would have ruled differently, but whether a reasonable person could have reached the same decision as the trial court based upon the same evidence, Cook v. Sullivan, 149 N.H. 774, 780 (2003); see also MacPherson, 158 N.H. at 10. We view the evidence in the light most favorable to the plaintiff. Fisher v. Minichiello, 155 N.H. 188, 190 (2007).

At the outset, we note that the defendant, both on appeal and in the trial court, has repeatedly attacked the initial protective order as based upon alleged falsehoods testified to both by the plaintiff and DePamphilis. The protective order is, however, a final judgment that we upheld following the defendant's appeal of it. See DePamphilis v. Maravelias, No. 2017-0139, 2017 WL 3468651 (N.H. July 28, 2017). The defendant is, therefore, precluded from challenging the trial court's determination that he stalked the plaintiff, or its findings of fact in granting the initial protective order. See, e.g., Gray v. Kelly, 161 N.H. 160, 164 (2010).

The record establishes that the initial stalking petition was precipitated by the defendant's December 2016 attempted gift to the plaintiff, on her sixteenth birthday when she was a high school sophomore and he was a twenty-one-year-old college senior, of a new Maserati sports car, and by his contemporaneous profession of "love" for her. In granting the protective order,

3

the trial court found that the defendant had in fact been obsessed with the plaintiff from the time she was only eleven years old. The trial court further found that the defendant had referred to sixteen as the "age of consent," and that when the plaintiff rejected the gift, he stated that he would continue to wait for her and would be back when she turned eighteen. The trial court observed that the defendant continued to profess his love for the plaintiff in his testimony, and that his demeanor "demonstrated his obsession for the plaintiff, including his constant communication directly to the plaintiff commenting on her mannerisms and professing his love for her." The trial court found that the defendant's "level of obsession and relentless pursuit of a girl beginning at the age of 11 or 12 gives rise to reasonable fear." The protective order restrained the defendant from stalking or abusing the plaintiff or her family members, or from contacting her, directly or indirectly.

In March 2017, less than two months after the protective order had gone into effect, DePamphilis received an anonymous letter purporting to have been written by a "girl from Windham" who was a "friend" of the defendant. The letter accused DePamphilis of allowing the plaintiff to have a "fling" and an alleged sexual relationship with a twenty-year-old man with whom the defendant had gone to high school. The letter contained graphic allegations concerning the alleged sexual behavior and character of the alleged boyfriend, referred to DePamphilis as a "warped a**hole," "derelict father," and a "total f*cking liar," referred to the plaintiff's mother as DePamphilis's "EVIL B*TCH wife" and "sh*t wife," and referred to the plaintiff as a "spoiled nice-girl-turned-whore," a "whorish girl[]," a "sick bitch," and an "EVIL f*cking slut." By contrast, the letter referred to the defendant as an "innocent gentleman," "the only guy who truly loved" the plaintiff, and a person who had waited five years, and had maintained his virginity, for the plaintiff.

The March 2017 letter expressed outrage that DePamphilis and the plaintiff had allegedly lied to obtain the protective order, that as a result of the order, the defendant's "property" had been seized by the police, and that the plaintiff's alleged boyfriend was almost the same age as the defendant. The letter additionally claimed that the defendant had an audio recording that allegedly proved that DePamphilis and the plaintiff had lied, and accused the plaintiff of successfully excluding that recording from evidence in the stalking trial. The record in fact establishes that, at the hearing on the initial stalking petition, the trial court excluded from evidence an audio recording that the defendant had surreptitiously made of the birthday encounter with the plaintiff on the basis that he had violated RSA 570-A:2 (Supp. 2018) in recording the encounter. See RSA 570-A:6 (2001). The record further establishes that the defendant subsequently pleaded guilty to violating RSA 570-A:2.

Finally, the March 2017 letter accused the plaintiff of consuming alcohol with older men. Attached to the letter were photographs from the plaintiff's social media accounts that, according to the letter, depicted the plaintiff with

4

her alleged boyfriend, depicted the alleged boyfriend in the plaintiff's bedroom, and depicted the plaintiff consuming alcohol.  The letter "demand[ed]" that DePamphilis "not share or communicate any part of [it] to anyone else."

At the hearing on the motion to extend the protective order, the defendant claimed that he was not the March 2017 letter's author.  He readily admitted, however, that he had "aided" in its "composition," and that he had been aware that it had been sent to DePamphilis at the plaintiff's home.  Moreover, he created a webpage with the address, "https://davidtheliar.com/," to which he linked pleadings that included a copy of the March 2017 letter.  When either the plaintiff's name or DePamphilis's name is entered into the Google search engine, the webpage appears.

In April 2017, the Windham Police Department executed a search warrant in connection with its investigation of the defendant's violation of RSA 570-A:2.  During the search, police officers found, and photographed, several soft drink bottles bearing the plaintiff's name that the defendant had lined up on a desk.  Police officers additionally found, and photographed, a scripted quotation on the defendant's bedroom wall above his bed that matched an identical quotation on the plaintiff's bedroom wall.  During his testimony at the hearing on the motion to extend the protective order, the defendant claimed that he had placed the quotation on his bedroom wall merely as a "joke" for the benefit of his sister, who had once been the plaintiff's "best friend," and he admitted that the quotation had been there for some time prior to 2017.

On November 2, 2017, the defendant wrote a letter to counsel for the plaintiff in response to a request to take down the "David the Liar" webpage.  In the November letter, the defendant referred to the plaintiff as "[t]he Windham-gossip-object slut," "that ugly and disreputable whore," and a "pathetic 16 year-old delinquent," and asserted sexually-charged allegations concerning the plaintiff and her alleged boyfriend similar in content and tone to the allegations in the March 2017 letter.  He further asserted that he "possess[ed] troves of reputationally damaging information and assorted digital artifacts of [DePamphilis's] family members which [he had] not shared," and threatened that if DePamphilis pursued a defamation case against him, he would "go nuclear and utterly destroy [the plaintiff's] academic and professional future by publishing these embarrassing artifacts on the internet."  At the hearing on the motion to extend the protective order, the defendant testified that by this statement, he was referring to "artifacts that [he possessed] from [the plaintiff's] social media" accounts that, he claimed, put her in compromising positions.  The defendant readily admitted that, in collecting such artifacts, he was "very . . . preoccupied with what [the plaintiff] does."

Approximately one month later, the defendant wrote an e-mail to four teachers at the plaintiff's high school "demand[ing]" that she be dismissed from the school's National Honor Society chapter.  In the e-mail, the defendant

5

accused the plaintiff of committing perjury at the hearing on her stalking petition, causing him to lose his firearms, and claimed that she had engaged in other crimes as well. He called the plaintiff "a delusional criminal," accused her of being "an out-of-control abuser of alcohol and psychoactive substances," and stated that if the teachers "need[ed] documentation on [the plaintiff's] addictive marijuana habits," he would "happily send further documentation." He "welcomed" the sharing of the e-mail with others and invited the teachers to "contact [him] for further info regarding the dismissal," but he requested that the e-mail not be "relay[ed] . . . in any manner . . . to [the plaintiff] lest she and her vindictive father have [him] arrested" for violating the protective order.

    At the hearing on the motion to extend the protective order, the plaintiff testified that she continued to fear the defendant because, despite the existence of the protective order, he was attempting to harm her. She had surmised that the defendant was behind the March 2017 letter because she "could not fathom someone writing that other than" the defendant, and was "scared of the anger and tone that was in th[e] letter." She further explained that the defendant could not have obtained the photographs attached to the March 2017 letter unless he had obtained nonpublic information about her social media account, and that upon learning that the defendant was accessing her social media photographs, she felt "[h]opeless," and as though she had lost her "private life." The plaintiff felt intimidated by the defendant's threat to publish "troves of reputationally damaging information and assorted digital artifacts" concerning her, and was concerned that his obsession had gone "from a love obsession to now a hate obsession." The defendant's attempt to have the plaintiff expelled from the National Honor Society, she explained, further caused her to "feel hopeless" because, if the defendant's claims were believed, her "future could change because of him." She expressed fear "that he would continue doing this for the rest of [her] life," testifying that he was "taking everything [she had] built for [her]self and trying to tear it to pieces and trying to have other people believe that as well." She expressed concern that, in the absence of a protective order, the defendant would "go further than just send letters to my school to try to get me kicked off the National Honor Society. I believe he's going to try to ruin my chances of college, ruin my chances of having a career, . . . or try[] to ruin relationships in the future." She observed that "just with getting a boyfriend flipped a switch."

    During his cross-examination of the plaintiff, the defendant introduced a photograph and a video of the plaintiff that he had possessed from when she was only twelve years old, both of which he claimed contradicted her testimony. With respect to the photograph, the defendant suggested that it showed her in a "flirtatious pose" with him, and that her leg was "scantily clad." The plaintiff testified that she had not been aware at the time of the picture or video that she was being photographed. At another point during the plaintiff's cross-examination, the defendant implied, when he thought she had

6

misunderstood a question, that she must have been intoxicated, drawing a pointed reprimand from the trial court.

During his own testimony, the defendant referred to the plaintiff as a "delusional criminal," a "slandering, dissolute criminal," a "perjuring, fornicating daughter," and a "lying pig." He additionally testified that the plaintiff "deserved" to be called the terms he had referred to her as in his November 2, 2017 letter to her attorney, such as "slut" and "ugly and disreputable whore," that such language was "justified, merited, and appropriate," and that he was happy that she had seen the letter. With respect to his threat to "go nuclear and utterly destroy [the plaintiff's] academic and professional future," the defendant testified that he "still [had not] made good on [the] threat," but that if the court did not "give [him] justice" and he was "still branded a stalker" after the hearing, he would "combat that on the internet, on YouTube." He admitted to using login credentials of other persons to gain access to the plaintiff's social media accounts and take "screenshots" from them, claiming that, even though the plaintiff had not granted him access to the accounts, her "quasi-private" posts were necessarily "public."

In finding good cause for the extension, the trial court concluded that the March 2017 letter that the defendant had aided in composing, the November 2, 2017 letter, the e-mail to the high school teachers, the soft drink bottles bearing the plaintiff's name, and the scripted quotation on the defendant's bedroom wall duplicating the quotation on the plaintiff's bedroom wall "demonstrate[d] a strange, perverse and unhealthy obsession . . . that appears to have begun when the [plaintiff] was approximately 11-12 years old . . . and continues to this day." The trial court further found that the defendant's conduct was "without any legitimate purpose and for the sole purpose of harassing and stalking the [plaintiff]," that the plaintiff had a "reasonable basis to fear for her personal safety and that of her family members," and that she "does, in fact, so fear for her personal safety and that of her family members."

Upon this record, we conclude that the trial court's findings of fact were supported by the evidence. Viewed in the plaintiff's favor, the evidence establishes that, after having been found to have stalked the plaintiff, a minor who was still in high school, and after having been restrained from further stalking her or members of her family, the defendant: (1) accessed the minor's social media accounts, to which she had not granted him access, by using the login credentials of other persons; (2) learned that the minor was in a relationship with a man whom he knew, and believed that the relationship was sexual in nature; (3) collected "troves" of digital images from the social media accounts that he believed were "reputationally damaging"; (4) "aided" in writing a letter to the minor's father that accused the father of allowing the minor to engage in a sexual relationship with an adult, accused the minor of being a "whore" and a "slut" and engaging in underage drinking, and attached photographs from the minor's "quasi-private" social media accounts; (5) wrote a

7

letter to the minor's attorney accusing the minor, in highly profane terms, of having a sexual relationship with the adult, calling her a "slut" and "disreputable whore," and threatening to publish, online, "troves of reputationally damaging images" from her social media accounts; (6) wrote an e-mail to teachers at the minor's high school accusing her of being a criminal, engaging in underage drinking, and abusing drugs, offering to share evidence of her drug use, demanding that she be expelled from the National Honor Society, and encouraging the teachers to share the e-mail with other teachers; (7) created a webpage, to which a "Google" search of the minor's name directs, on which he linked digital images of the letters and e-mail; (8) referred to the minor, in open court, as a "criminal," "fornicating daughter," and "lying pig," and insinuated that she was intoxicated; (9) threatened, in open court, to publish the "troves of reputationally damaging" images from the minor's social media accounts if the trial court extended the order; and (10) admitted, in open court, that he is "very . . . preoccupied with what [the minor] does."

Based upon this course of conduct, the trial court reasonably found that the defendant's "sole purpose" in writing, or aiding in writing, the letters and e-mail was to further stalk and harass the plaintiff. Cf. State v. Craig, 167 N.H. 361, 377 (2015) (finding that by posting statements to his own Facebook page directed to the victim under circumstances in which he knew the victim was likely to view the statements, the defendant had indirectly contacted the victim in violation of restraining order). Moreover, in view of the fact that the defendant engaged in this conduct while already subject to a court order specifically restraining him from stalking or abusing the plaintiff or members of her family, the trial court's finding that the plaintiff has a "reasonable basis to fear for her personal safety and that of her family members" is likewise reasonable. Under these circumstances, the trial court reasonably could have determined that, without a protective order, the plaintiff's safety and well-being would be in jeopardy. MacPherson, 158 N.H. at 10. Accordingly, the trial court's determination that good cause exists to extend the protective order was neither lacking in evidentiary support nor tainted by error of law, and its decision to extend the order was well within its discretion. Id.

We next address the defendant's constitutional challenges to RSA 633:3-a, III-c. The defendant argues that the "safety and well-being" language of RSA 633:3-a, III-c is facially overbroad and unconstitutional as applied to him for purposes of the First Amendment to the United States Constitution and Part I, Article 22 of the New Hampshire Constitution. Specifically, he argues that the term "well-being" is significantly broader than "safety," and may encompass a person's state of comfort, health, or happiness. He further argues that protecting a stalking victim's "well-being," in this context, may implicate a stalking defendant's constitutionally-protected speech, and that because, he claims, the March 2017 letter, the November 2, 2017 letter, and the e-mail to the plaintiff's high school teachers each contained or constituted his protected speech, the statute is unconstitutionally overbroad both facially and as applied

8

to him.  He further argues that the phrase "safety and well-being" is "unintelligible" and "so loosely constrained" as to invite "arbitrary, discriminatory enforcement" and, thus, that it is unconstitutionally vague.  The plaintiff counters, in part, that these arguments are not preserved.

It is the defendant's burden, as the appealing party, to establish that he preserved his appellate arguments.  See Bean v. Red Oak Prop. Mgmt., 151 N.H. 248, 250 (2004).  The purpose of the preservation requirement is to afford the trial court an opportunity to address the arguments and correct any errors it may have made before the arguments are presented for appellate review.  State v. Mouser, 168 N.H. 19, 26 (2015).  An appealing party does not satisfy this burden merely by raising an issue generally in the trial court, and then developing on appeal an entirely new argument in support of that issue that the appealing party did not develop in the trial court.  See id. at 26-28.

To prevail on a facial challenge to a statute on free speech grounds under the State or Federal Constitution, the defendant must establish that either: (1) no set of circumstances exists under which the statute would be valid; or (2) a substantial number of the statute's applications are unconstitutional in relation to its plainly legitimate sweep.  Doyle v. Comm'r, N.H. Dep't of Resources & Economic Dev., 163 N.H. 215, 220-21 (2012).  To establish that a statute is unconstitutionally vague, the defendant must show that it either: (1) fails to give persons of ordinary intelligence a reasonable opportunity to understand what it prohibits; or (2) authorizes or encourages arbitrary and discriminatory enforcement.  MacPherson, 158 N.H. at 11.

In this case, on multiple occasions at trial, the defendant took the position that the conduct identified in the plaintiff's motion to extend the protective order could not serve as the basis for extending the order because it constituted protected speech under the First Amendment.  During his closing argument, the trial court asked the defendant to "reconcile [his] claim for protected speech versus the stalking statute."  In his motion for reconsideration, the defendant argued that the trial court had "VIOLATE[D] [HIS] STATE AND FEDERAL CONSTITUTIONAL RIGHTS SINCE IT RELIE[D] UPON HIS TWO ACTS OF CONSTITUTIONALLY PROTECTED, LAWFUL SPEECH," namely, the November 2, 2017 letter to the plaintiff's attorney, and the e-mail to the plaintiff's high school teachers.

Although the defendant also asserted in his motion for reconsideration that "THE STALKING STATUTE IS FACIALLY INVALID AND/OR INVALID AS APPLIED ACCORDING TO THE STATUTORY OVERBREADTH AND/OR VAGUENESS DOCTRINES, AS THE COURT BASELESSLY FOUND LAWFUL SPEECH TO THIRD PARTIES TO CAUSE 'REASONABLE FEAR' AND THREATEN [THE PLAINTIFF'S] 'SAFETY AND WELL-BEING,'" he did not develop these arguments in the trial court.  Indeed, the defendant did not identify which language in the statute he believed to be vague, proffer his

9

interpretation of "safety and well-being" that serves as the foundation for his constitutional arguments in his brief, or otherwise argue how the statute was overbroad or vague. In contrast to the single passing reference to the "statutory overbreadth and/or vagueness doctrines" in his motion for reconsideration, the defendant's constitutional arguments on appeal consist of fourteen pages of statutory and constitutional analysis.

Under these circumstances, we conclude that the defendant's facial-overbreadth and void-for-vagueness arguments are not preserved. By failing to develop these arguments, either factually or legally, in the trial court, the defendant effectively deprived the trial court of an opportunity to correct its alleged error in the first instance. See Mouser, 168 N.H. at 28; cf. State v. Bradberry, 129 N.H. 68, 81 (1986) (Batchelder, J., concurring) (observing that "[a]dvocacy consists of something more than citation or incantation," and that "mere passing reference to an issue does not suffice to present that issue for appellate adjudication").

We agree with the defendant, however, that by arguing at trial that the conduct identified in the motion to extend the protective order — the March 2017 letter, the November 2, 2017 letter, and the e-mail to the high school teachers — constituted protected speech for which the protective order could not be extended, the defendant effectively raised an as-applied challenge. Moreover, the trial court's request that the defendant "reconcile [his] claim for protected speech versus the stalking statute" demonstrates that the trial court understood the defendant to be arguing that RSA 633:3-a, III-c could not be applied to the conduct identified in the motion to extend the protective order consistent with his free speech rights. Accordingly, we conclude that the defendant's as-applied constitutional challenge to RSA 633:3-a, III-c, at least insofar as he argues that his conduct constituted protected speech, is preserved. See State v. Wilson, 169 N.H. 755, 768-70 (2017) (finding that ambiguous arguments in trial court preserved as-applied vagueness challenge, but not facial vagueness challenge). We first address the argument under the State Constitution and rely on case law interpreting the Federal Constitution only to aid in our analysis. State v. Ball, 124 N.H. 226, 231-33 (1983).

Not all speech is constitutionally-protected. See, e.g., Beauharnais v. Illinois, 343 N.H. 250, 266 (1952). "When . . . an individual speaks to another person, whether through telephonic or other electronic means, not to communicate, but for other unjustifiable motives, that conduct is not speech protected by the First Amendment." Childs v. Ballou, 148 A.3d 291, 297 (Me. 2017) (quotation omitted). A defendant "has no First Amendment right to inflict unwanted and harassing contact on another person." State v. Mott, 692 A.2d 360, 365 (Vt. 1997). This is particularly the case when the defendant has already been found to have stalked the other person, and ordered not to stalk that person further. See State v. Heffron, 190 A.3d 232, 236 (Me. 2018); Childs, 148 A.3d at 297; Mott, 692 A.2d at 365.

10

In this case, the trial court supportably found, as discussed above, that the defendant either aided in writing or wrote the March 2017 letter, the November 2, 2017 letter, and the e-mail to the high school teachers "for the sole purpose of harassing and stalking the [plaintiff]." Under these circumstances, the letters and e-mail in question did not amount to protected speech for purposes of Part I, Article 22 of the State Constitution. See, e.g., Heffron, 190 A.3d at 236 (ruling that posts to defendant's Facebook page directed at person protected by a protective order violated the order and, thus, were not constitutionally protected); Childs, 148 A.3d at 299 (finding no First Amendment violation in the extension of a protective order based in part upon the defendant's repeated requests that the police conduct "well-being checks" on his child when the trial court found that such requests amounted to stalking of the child's mother in violation of the protective order). Because the Federal Constitution provides the defendant with no greater protection than does the State Constitution under these circumstances, see Childs, 148 A.3d at 299, we reach the same result under the Federal Constitution.

Each of the defendant's remaining arguments is not sufficiently developed to warrant further review. See Blackmer, 149 N.H. at 49. We note, however, that to the extent the defendant suggests that he had an absolute right to record video of the plaintiff under District Division Rule 1.4, Rule 1.4 contemplates that the trial court may limit a party's ability to record the proceedings. See Dist. Div. R. 1.4(f); see also Dist. Div. R. 1.1 (trial court may waive application of any rule for good cause and as justice may require). Here, the trial court was well within its discretion to prohibit the defendant from recording video images of the minor victim of his stalking, about whom he had already threatened to publish "troves of reputationally damaging information and assorted digital artifacts" online.

We further note that, to the extent the defendant argues that the trial court was biased, we have reviewed the record in this case, and can find no basis upon which a reasonable person would have questioned Judge Coughlin's impartiality, or any evidence that any of the factors that would have per se disqualified Judge Coughlin was present. See State v. Bader, 148 N.H. 265, 268-71 (2002). The mere fact that the trial court issued decisions that were adverse to the defendant does not establish judicial bias. See id. at 271.

Affirmed.

Lynn, C.J., and Hicks, Bassett, and Hantz Marconi, JJ., concurred.

**Eileen Fox,
Clerk**

11

Distribution:
10th N.H. Circuit Court - Derry District Division, 473-2016-CV-00124
Honorable John J. Coughlin
Honorable David D. King
Mr. Paul Maravelias
Simon R. Brown, Esq.
Attorney General
Tim Gudas, Supreme Court
Allison Cook, Supreme Court
File