

THE STATE OF NEW HAMPSHIRE

SUPREME COURT

2018 TERM

Case No. 2018-0483

RECEIVED
NEW HAMPSHIRE
SUPREME COURT
2018 DEC -3 P 1: 21

CHRISTINA DEPAMPHILIS

Plaintiff-Appellee

vs.

PAUL MARAVELIAS

Defendant-Appellant

RULE 7 MANDATORY APPEAL OF STALKING FINAL ORDER
OF PROTECTION

From 10th Circuit Court – District Division – Derry

## DEFENDANT'S REPLY BRIEF

Submitted by Defendant,

**Paul J. Maravelias**
34 Mockingbird Hill Rd
Windham, NH 03087
paul@paulmarv.com
603-475-3305

ORAL ARGUMENT
REQUESTED

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................. 3

STATEMENT OF THE CASE AND FACTS ........................................ 5

ARGUMENT-IN-REPLY ................................................................. 12

    **I.**    **RSA 633:3-A, III-C. IS UNCONSTITUTIONAL ...... 12**

        A. The Issue Was Manifoldly Preserved ........ 12

        B. The Statute is Overbroad ............................ 15

    **II.**    **THE TRIAL COURT UNSUSTAINABLY EXERCISED DISCRETION GRANTING THE EXTENSION AGAINST MARAVELIAS, THE VICTIM OF DEPAMPHILIS'S HARASSMENT .... 18**

    **III.**    **THE TRIAL COURT VIOLATED MARAVELIAS'S DUE PROCESS RIGHTS ............................................ 19**

        A. The Anti-Videotaping Injunction Was Illegal and Prejudicial ................................................. 19

        B. The Untimely-Hearing Issue Was Preserved, Not Waived ..................................................... 20

CONCLUSION ................................................................................... 22

PRAYER FOR ORAL ARGUMENT .................................................. 24

APPENDIX .......................................................................................... 25

# TABLE OF AUTHORITIES

## Cases

Appeal of Martino, 138 N.H. 616 (1994) .................................................... 21

Keenan v. Fearon, 130 N.H. (1988) ............................................................ 13

MacPherson v. Weiner, 158 N.H. (2008) .................................................... 17

McCarthy v. Wheeler, 152 N.H. 643 (2005) ............................................... 20

Mortgage Specialists v. Davey, 153 N.H. (2006) ................................. 13, 20

N.H. Dept' of Corrections v. Butland, 147 N.H. 676 (2002) ...................... 13

Palazzi Corp. v. Stickney, Comm'r, 136 N.H. (1992) .......................... 14, 20

Ross v. Ross, 172 A.3d 1069 (2017) ...................................................... 13, 20

Smith v. Shepard, 144 N.H. 262 (1999) ................................................ 14, 20

State v. Demeritt, 148 N.H. 435 (2002) ...................................................... 12

State v. Troy Burpee (2014-0179) ............................................................... 12

State v. Tselios, 134 N.H. (1991) ................................................................ 20

## Constitutional Provisions

First Amendment to the Federal Constitution ................................. 12, 15, 16

Second Amendment to the Federal Constitution ......................................... 15

New Hampshire Constitution Part I, Article 15 .......................................... 14

**Statutes**

RSA 633:3-a, I.(c) ........................................................................... 16

RSA 633:3-a, III-c. .......................................................... 15, 16, 17

**New Hampshire Rules of the Circuit Court - District Division**

Rule 1.4(f)....................................................................................... 19

## STATEMENT OF THE CASE AND FACTS

Maravelias relies upon his Brief-in-Chief's statements of case and facts. Seeing that Appellee's brief takes indefensible, inflated liberties with the record, Appellant hereinafter non-extensively corrects false factual stipulations in Appellee's brief crafted to disparage and defame Paul Maravelias.

| Falsehood | Truth-from-record |
|---|---|
| *"[Maravelias] followed through on his threat" (OB40)[1]* | Maravelias invites The Honorable Court to take a gander at what kind of activities Christina DePamphilis pictured herself doing on social media (A167) which Maravelias <u>never publicized online nor attempted to introduce.</u> (T414:3-4,415:7;A167) His <u>private</u> email to Mrs. Smith was not a fulfillment of any threat. (T413:23-24,415:7) |
| *"[six years ago] noticed Maravelias displaying romantic* | *See* direct refutations at RApp6,7,9. *See also* DePamphilis's neurotic definition of "romantic overture" at T36-37. |

---

[1] Record-citations identical to Appellee's brief, with addition of:

OB = Appellee DePamphilis's 11/21/18 Opposing Brief
RApp = Appendix herewith

| | |
|---|---|
| *feelings towards her when she was only 11 years old" (OB8)* | Maravelias had only seen DePamphilis <u>two times</u> in the three whole years before 12/12/16. (A98) |
| *"Maravelias surreptitiously took a photograph of her at a party at his house", "secret photo" (OB9) "surreptitious photograph" (OB32)* | Maravelias was casually "snapping pictures" around <u>his own 6/29/13 graduation party she chose to attend,</u> with the camera clearly visible. (T449:20-22) |
| *"[directionality of] hugs" (OB9)* | *See* T158-159<br>Christina DePamphilis was videotaped[2] bursting through the crowd at the 2013 Windham Turkey Trot to interrupt Maravelias's conversation and give him a hug, three years before mendaciously re-fabulating this incident in a 2016 stalking petition. She finally got busted for her stalking-petition-falsity on 5/4/18 when this video was first played. (Brief24-26) |

———————————————

[2] https://youtu.be/EAawoOcFGVg

*"Maravelias recruited his sister to secretly obtain Christina's Twitter password, allowing him to follow her private account"(OB9) and similar falsehood at OB12*

Maravelias debunked the false "Twitter hacking" accusations countless times. (RApp4;T346)
*Comment:*
Regarding creepy online hacking, DePamphilis has been obsessively prowling Maravelias's private discussion forum for owners of his software product, to which she somehow gained illicit access without being one of Maravelias's customers. (A61¶13,A62)

*Maravelias wanted to walk with Christina at the [2013] event" (OB10)*

*See* Video at 1:24, T379:12-17
Maravelias wanted to return to conversing with his school-friends after Christina DePamphilis rudely interrupted him exclaiming "Hi Paul!" and begged for further attention-validation, "I'm promoting your college!" [*Re* the Dartmouth sweater Maravelias had gifted her and his sister three-months-prior, which she was wearing]

*"at Maravelias' house in 2016, [he] stared at Christina so much" (OB10)*

Christina DePamphilis went to Maravelias's house on 6/18/16 for a family party and normally greeted Maravelias, saying "hi" to him in his kitchen. (Brief17;T188) While "intentionally ignoring" her (T186:20), Maravelias was

7

conversing in his backyard with two individuals; Appellee happened to be seated behind them.

Mere weeks thereafter, in February 2017, **as a barely-16-year-old, she secretly absconded to her father's beach house in Salisbury, Massachusetts with a 21-year-old man to have sex with him, and *did*, in fact, have sexual intercourse with him**[3] **(Brief22,28;A88;T146:9-19,425:23,410:8) - the same exact age difference (16 and 21) as in Maravelias's platonic dinner-date-proposal inviting her mommy to tag-along too. (T143-145)**

*"Given their age difference ... Christina thought Maravelias' actions on her birthday were 'insane'"*
(OB11)

---

[3] As crossing state lines engenders federal jurisdiction where the sexual age-of-consent rises to 18, 16-year-old Christina DePamphilis implicated herself and her 21-year-old boyfriend Matthew LaLiberte in federal felony sex crimes under 18 U.S.C. § 2422, 2423 punishable by up to 30 years in federal prison, as well as an additional Massachusetts state-level felony violation of M.G.L. 272§4, "Inducing person under Eighteen to have sexual intercourse".

As these two un-convicted sex offenders were off jollily honeying over the nasty sty in Winter/Spring 2017, Paul Maravelias was finishing school stoic, chaste, and overwhelmed into inadvertent long-duration fasting, having to explain to friends why Windham Police was raiding his Dartmouth dorm room on 4/6/17 (because he'd pressed a button on his cellphone to record himself, and later tried to disprove DePamphilis's vile perjuries in court) – having been falsely branded a "stalker" by an incompetent New Hampshire family court for asking-out a girl on a date first-time in his life. Then, a few months later, out-of-the-blue, Christina DePamphilis and her boyfriend (and David DePamphilis) pleasured themselves with their cruel 6/21/17 social media bullying of Maravelias (Brief21-22;A11-13), rubbing-in the boyfriend, baiting Maravelias to respond.

*Comment:*

Where Maravelias's romantic traditionalism values finding a younger spouse and premarital abstinence therewith, DePamphilis called this 'insane' and preferred to fornicate with a man called a "college-age" "man-whore" (A76) in an exhibit she entered. Her exhibit alleges this man had slept with "over 20 other girls including one of her own friends". (A77,78)

*"Christina had not had recent contact with [him]" (OB10)*

*See supra* (came to his house earlier that year)

*"believed Maravelias hacked into her social media in order to obtain photographs attached to the letter" (OB12)*

Maravelias simply <u>did not write the March 2017 letter</u> (Brief27-28;T403,461-465;A17,88), as further proven by his noted inability to access such photographs.

*"[at 22], Maravelias chose to become confirmed at [Maravelias's]*

Maravelias indicated he didn't have time for religious formalities while in school, and that 2018 was his first year out-of-school. (T429,430)

| | |
|---|---|
| *church" (OB13) (insinuating recent choice)* | |
| *"a violation of state criminal law" (OB14)* | Maravelias recorded his own conversation with an Android smartphone app "in the open outdoors" where there was no "expectation of privacy". (T443) |
| *"This frightened Christina" (OB15)* | "Christina" <u>was not there at all at Shaw's</u> when Maravelias took a self-defensive cell-phone-video, <u>correctly anticipating</u> a false, frivolous police report by Laurie DePamphilis. (T229) |
| *Lamentations that Maravelias insulted Christina DePamphilis outside court* | Maravelias's free-speech-acts reacting to this legal-abuse outrage, occasionally accurately insulting, were made to third-parties in private. (T422:20) Only once did he use offensive language. (T426:15-18) |

It is disappointing that Appellee's brief contains nine-parts regurgitated, defamatory dramatization for every one-part actual legal counterargumentation. Despite routine attempts to make it sound otherwise

with alarmist, emotional diction, Maravelias <u>never</u> "stalked" DePamphilis.[4]
*See* RApp1-11, Maravelias's 2017 extensive trial-court-exhibit disproof of
the 12/28/16 stalking petition.

_____

[4] Casual invitation for an after-work leisurely amble to the Windham Police
Department is extended to the reader, a place where he or she may listen to the
12/12/16 audio recording and ascertain that Maravelias <u>never mentioned anything
remotely close to the creepy "age of consent" quote</u> upon which Judge Stephen
specifically predicated the whole underlying stalking order.

<u>**ARGUMENT-IN-REPLY**</u>

## I.    RSA 633:3-A, III-C. IS UNCONSTITUTIONAL

### A. <u>The Issue Was Manifoldly Preserved</u>

There is not the shadow of plausibility to Appellee's suggestion that Maravelias failed to preserve the constitutional issue.

Firstly, Maravelias <u>did</u> raise the "First-Amendment issue" (T302) at-trial, complaining the "<u>overbroad</u> stalking statute" would violate "free-speech rights" if extension were granted based on his "talking to other people about [Appellee]" (T301-303). The trial court explicitly announced it understood Maravelias was making "a free-speech argument" (T330-331) (*See also* T58,468:19-20), even directly questioning at closing-argument, "how do you reconcile your claim for protected speech versus the stalking statute?" (T471) Making arguments verbally "clear to the trial judge" sufficiently preserves issues for appellate review. *See* <u>State v. Troy Burpee</u> (2014-0179), <u>State v. Demeritt</u>, 148 N.H. 435 (2002).

Appellee disregards the nature of an as-applied challenge. At trial, pre-final-decision, a party is generally unable to advance this kind of argument, which here depends on the court's [third-party-speech-acts-based] <u>reasoning for extension</u>. Though not expected therefore to raise this issue

at-trial, Maravelias went above-and-beyond. He presciently equipped the trial court to consider this key issue <u>even before</u> the post-trial stage.

Secondly, even if Maravelias never raised the issue at-trial, his Motion for Reconsideration preserved it. Here, Appellee's brief runs afoul of pertinent case law. "The defendants raised their argument ... in their [motion] to reconsider ... Thus, the defendants' failure to raise the issue earlier did not deprive the trial court of the opportunity to address it. Therefore, the argument is preserved." <u>Ross v. Ross</u>, 172 A.3d 1069 (2017). *See* <u>Mortgage Specialists v. Davey</u>, 153 N.H. (2006) at 786, 904 ("[issue preserved] if raised in motion for reconsideration and failure to raise issue earlier did not deprive trial court of opportunity to correct error"). *Cf.* <u>N.H. Dept' of Corrections v. Butland</u>, 147 N.H. 676 (2002). "The defendant never raised the issue [at-trial] ... she could have raised the issue in a motion for reconsideration". *Id.*

Maravelias's reconsideration-stage presentation of the argument was not insufficiently developed nor limited to one heading. Maravelias's 6/25/18 Motion bifurcated the instant argument into two related headings found at A50 *and* A48, mention of which Appellee's brief conveniently omits (citing only "A50" at OB21). While Maravelias apportioned two whole gratuitous paragraphs on this issue (A48¶34-35), the headings alone sufficiently articulated a concise, specific legal argument. Decisively not an "off-hand reference" nor "laundry list", it was a 1) seriously presented constitutional issue with 2) articulated argument and 3) cited authority, itself already developed at-trial. *Cf.* <u>Keenan v. Fearon</u>, 130 N.H. (1988) at

499, where this Court declined to address claims lacking these three
attributes.

Further, in generic fairness, Maravelias was compelled to argue
laconically in his replete Motion for Reconsideration given the 10-page-
limit incumbent thereon and the multifarious plethora of injustices here. *See*
Dist. Div. R. 3.11(E)(1). Insofar as optimal appellate preservation prefers
he have more thoroughly briefed the constitutional issue pre-appeal, the
aforecited rule is simply unfair and/or unconstitutional under Part I, Article
15 of the state constitution.

Thirdly, the trial court did not sustainably nor lawfully depose of the
issue in denying Maravelias's Motion for Reconsideration. Appellee's
citation of Smith v. Shepard, 144 N.H. 262 (1999) is inapplicable since
Maravelias *did* raise the issue at-trial before seeking reconsideration.
Regardless, the citation to Smith is meaningfully incomplete: although a
court may decline to address new issues or consider new evidence on a
reconsideration motion, it must then "set forth the exact basis for its denial
of the motion for reconsideration to allow for meaningful appellate review."
Smith, *supra*, citing Palazzi Corp. v. Stickney, Comm'r, 136 N.H. (1992).
"The exact basis for the court's denial of the motion for reconsideration is
unclear. Accordingly, we remand this issue for further resolution." *Id*. Here,
Judge Coughlin's legal basis for denying the Motion for Reconsideration
was nothing more than the vapid repetition of his favorite word: "Denied".
(A3)

The issue is preserved; Q.E.D.

B.  <u>The Statute is Overbroad</u>

Appellee does not contest Maravelias's vagueness nor facial overbreadth challenges of constitutionality. She disputes the as-applied overbreadth claim on unclear grounds. First, she claims the statute "does not address free speech", but offers no support. Since the trial court continued the criminalization of Maravelias's second-amendment-protected firearm possession, *inter alia,* based on his third-party, objectively lawful speech-acts, the statute irrefutably burdened the exercise of Maravelias's free speech. (Brief32-34)

Appellee then asserts Maravelias's referenced speech-acts lacked First-Amendment protection to begin with. In support, she cites a scatterbrained gallimaufry of totally inapplicable cases from foreign jurisdictions extraneous to the legal question at-hand. These misplaced citations at OB26-27 merely indicate that other states have upheld the constitutionality of restraining order direct-or-indirect-speech-to-victim prohibition terms. Nowhere does Appellant Maravelias's argument attempt to undermine the generic constitutionality of final protective order terms where theoretically appropriate; his argument rather concerns the unconstitutional overbreadth of the <u>allowable range of lawful speech-acts which may permit a trial court to extend such restraining orders</u>, specified in RSA 633:3-a, III-c.

Petitioner's desperate, newfound allegation that Maravelias "violated the order" is misplaced. Firstly, this needing-to-be-estopped allegation appeared nowhere in her Motion to Extend, apart from referencing the

12/15/17 false arrest for Maravelias's private email to Mrs. Smith – idiotic charges later dropped. Secondly, even if Maravelias's third-party speech-acts violated the Order, that would render the statute *more* overbroad, not less (newly implicating subsection I.(c), beyond solely III-c.), since the underlying third-party non-threatening speech remains lawful, non-Plaintiff-directed, and protected. (*See generally* A170-177) Appellee does not cite any recognized category of speech by which Maravelias's third-party communications would lose First-Amendment protection.

Contrary to her counsel's assertion at the top of OB26, Maravelias's [two] communications were protected speech-acts compliant with the protective order. As a futile last-resort, Appellee at OB25 calls the nasty March 2017 letter "Maravelias's letter to Christina's father" and a "communication to [him]", though false and unsupported by evidence. By now, Maravelias, the Windham Police, and the trial court itself have all disagreed with this impossible assertion. (Brief28) Even in his profoundly insincere anti-defendant amplified verbal posturing, invariably typical throughout his eight 2018 pre-retirement stalking orders (*See* A121-124), Judge Coughlin made no finding that any of Maravelias's communications were "indirect communications" to DePamphilis and thereby Order-violative. They were not; Appellee herself admitted Maravelias has had no contact with her whatsoever since 2016. (T27)

Appellee fantasizes that Maravelias is challenging the constitutionality of the "good cause" standard in isolation, entirely missing the point. She never addresses Maravelias's actual overbreadth argument regarding the extreme lack of narrow tailoring in the "safety and well-being" language

which ultimately controls the relief courts may grant on extension. Appellee opines there was "good cause" to extend, recoursing to familiar dramatics about Maravelias's expressed-to-third-parties righteous indignation. This is irrelevant to the constitutional question; Maravelias's argument needs not disturb this Court's ruling in <u>MacPherson v. Weiner</u>, 158 N.H. (2008) that "good cause" is not unconstitutionally vague[5].

Trial courts read "good cause" in context with the subsequent imperative commandment in 633:3-a, III-c. that they "shall … grant such relief as may be necessary to provide for the [plaintiff's] <u>safety and well-being</u>". If a plaintiff shows by "good cause" that extending the injunction will advance her "safety and well-being", the statute commands the trial court to do so. Thus, Appellee's disregard of Maravelias's actual constitutional overbreadth argument (pertaining to the improper substitution of "bring about the cessation of stalking" with "provide for the safety and well-being", remotely paralleled in the comparable restraining order laws of *no other state in the United States of America*) renders her counterargument misplaced.

---

[5] Still, only lack of vagueness – not overbreadth – of "good cause" was decided there.

## II.  THE TRIAL COURT UNSUSTAINABLY EXERCISED DISCRETION GRANTING THE EXTENSION AGAINST MARAVELIAS, THE VICTIM OF DEPAMPHILIS'S HARASSMENT

At OB30-32, Appellee's counsel makes a vain attempt at spin-slandering Maravelias with the estopped asininity regarding "obsession", embarrassingly skirting his own April 2018 *previous* obsession" comment (Brief47;A36,46,68-69) and disowning any 30-second-clip of Maravelias's testimony. To Attorney Brown's credit, he had already agreed to represent Christina DePamphilis before she got carried-away with her jezebelian psychological terrorism and made her 6/21/17 here's-my-21-year-old-boyfriend-and-my-dad-and-we're-middle-fingering-you, ha-ha-I-just-got-you-arrested-for-trying-to-disprove-my-lies, you-didn't-snap-at-my-first-harassing-post-so-I'll-bait-you-again (A13), "Did-Dartmouth-teach-you-how-to-do-this-🖕" (A11-12) incitative bullying social media post against Maravelias.

Attorney Brown is a competent trial lawyer and should not be measured by his likening "slander" (OB31) to truthful-and-supported negative statements about his 17-year-old perjuring criminal, drug-addict client (T275:25,370;A21,24,28,189,192,201) (Brief23-25;T421:18,A167-196) (Brief22;T450:21;A167), by his rank sycophancy to the textual onanism of Judge Coughlin's biased order (A115-149), nor by his witless claptrap that Maravelias's [written frustration] forms "legitimate concern for Christina's safety" (OB32). Maravelias deeply sympathizes that a New Hampshire attorney finds himself cornered into necessarily stooping to this level of

infantilistic, obscurantist absurdism, preposterous-seeming to any average person. The extension was beyond unsustainable.

### III.   THE TRIAL COURT VIOLATED MARAVELIAS'S DUE PROCESS RIGHTS

#### A.   The Anti-Videotaping Injunction Was Illegal and Prejudicial

In response to this preserved-at-trial (T5-7;9:1-3,484:17-19) legal issue thoroughly briefed in Maravelias's Motion for Reconsideration (A48-49), 7/5/18 responsive pleading (A60-64), and appellate brief (Brief52), Appellee merely mobilizes more ridiculous, self-plagiarized (A53) variations on her egotistical reality-denying "he's-still-obsessed-with-me" theme, garnished with obligatory reminders she was a "high school sophomore" in 2016 (OB34). Maravelias already panned this same unavailing response to the instant legal issue long-time-ago-in-a-trial-court-not-so-far-away. (A59-64)

Since the trial court did not support its anti-videotaping order with "particularized findings of fact that demonstrate the necessity of the court's action" as mandated by <u>Dist. Div. Rule</u> 1.4(f), it broke the law (*See* A62-63) – *willfully* so (T9:1-3). Furthermore, Appellee never identified any "overriding public interest" nor met the three requirements in the rule. *Id.* Where a documented habitual speaker-of-untruths-under-oath (Brief23-26) claims being videotaped "intimidates" her (OB34), the error removed an

effective dishonesty-deterrent (being *filmed*, not just audio recorded, lying), prejudicing Maravelias.

## B. The Untimely-Hearing Issue Was Preserved, Not Waived

Maravelias could not possibly object contemporaneously to a committed-in-the-past error. (A65¶28) Unlike a less-severe evidentiary or procedural error, the trial court lost personal jurisdiction to grant the requested relief when acting outside the statutory imperative "shall"-language temporal provision. *See* McCarthy v. Wheeler, 152 N.H. 643 (2005). Maravelias raised and briefed this issue in his Motion for Reconsideration. (A49,64-65) Accordingly, Maravelias's silence thereabout at-trial did not deprive the court an opportunity to correct its error of extending a stalking order without jurisdiction. *See again* Ross, Mortgage Specialists *supra* at 13. *See also* State v. Tselios, 134 N.H. (1991) at 407.

In fact, the trial court didn't even commit the error's actual prejudicial consummation until finally granting the extension absent personal jurisdiction, *after* all hearings ended. The trial court's one-word denial of the reconsideration motion unlawfully failed to set forth its reasoning anent this issue. *See again* Smith, Palazzi Corp., *ibid*. Moreover, Plain Error would doubtlessly otherwise apply.

The error prejudiced Maravelias every-which-way: 1) the stalking order continued restraining his constitutional rights without due-process, 2) the resultant moratorium granted DePamphilis enough time to obsessively

collect her pictures of Maravelias's private bedroom, <u>illegally-relied-upon as advance-noticed nowhere in her 1/5/18 extension motion, entered only at the 6/8/18 Hearing almost half-a-year-thereafter</u>, and 3) the DePamphilis actors were enabled to usurp improperly the <u>Maravelias v. DePamphilis</u> hearing as an anti-Maravelias slander-free-for-all regarding *this* case, biasing Judge Coughlin by the time he first heard this matter.

The shown prejudice authorizes remedial reversal of the extension order. "Where the legislature has failed to provide a method of enforcing a statutory mandate, we have looked to whether the party seeking relief has shown prejudice." <u>Appeal of Martino</u>, 138 N.H. 616 (1994).

## **CONCLUSION**

WHEREFORE, Defendant-Appellant Paul Maravelias reverentially prays The Honorable Court grant the relief requested in his Brief-in-Chief.

———————————

Respectfully submitted,

PAUL J. MARAVELIAS,

*in propria persona*

———————————————
Paul J. Maravelias                    THE THIRD DAY OF DECEMBER
34 Mockingbird Hill Road          IN THE YEAR OF OUR LORD MMXVIII
Windham, New Hampshire 03087
paul@paulmarv.com
(603) 475-3305

## **CERTIFICATE OF SERVICE AND RULE 16 COMPLIANCE**

I, Paul Maravelias, hereby certify that on this day were sent via first-class mail two copies of the within Defendant's Reply Brief and accompanying Appendix, postage prepaid, to Simon R. Brown, Esquire, Counsel for the Plaintiff-Appellee, Christina DePamphilis, P.O. 1318 Concord, New Hampshire, 03302-1318.

I, Paul Maravelias, hereby certify that this document was not drafted by a limited-representation attorney. *See* N.H. Sup. Ct. R. 16(10).

Certification, further, is made of the foregoing document's compliance to word-count limitation, 2,999 words being contained, exclusive of the herein addendum-certificate and of other addenda. *See* N.H. Sup. Ct. R. 16(11), 26(7).

December 3rd, 2018

_____

Paul J. Maravelias

## **PRAYER FOR ORAL ARGUMENT**

The Appellant, Paul Maravelias, respectfully requests Oral Argument before the full court pursuant to Rule 16(h). 15 minutes are requested.

## **APPENDIX**

### **Trial Court Exhibits**

Maravelias's January 2017 Dialectic Disproof of DePamphilis's
Mendacious 12/28/16 Stalking Petition, Entered as
Evidentiary Exhibit........................................................ RApp1

### **Ongoing Trial Court Litigation on Maravelias's 10/31/18 Motion to Set Aside Judgement (A115-149) Regarding Judge John J. Coughlin Bias/Judicial Misconduct**

Inexplicable 11/16/18 Two-Sentence Order Flatly Denying
Maravelias's Motion, Shockingly Signed by Believed-To-Be-
Retired Judge Coughlin Himself[6]................................ RApp12

Maravelias's 11/21/18 Motion for Recusal and Reconsideration,
Decrying the Further Judicial Misconduct of Judge Coughlin
Ruling on a Motion Analytically Arguing His Own Material
Misconduct, and Correcting DePamphilis's Incorrect
Objection That Maravelias's 10/31/18 Motion to Set Aside
Judgement Was "Untimely"........................................ RApp14

---

[6] The rank ineptitude of the Derry trial court in unlawfully disclosing the
residential whereabouts of the Plaintiff in this mailed Order (in violation of RSA
173-B:3 I.) is redacted in this Appendix herewith. This error seems to have been
committed by Judge Coughlin himself, rather than by the clerk, as it appears on
the page of his Order (RApp13) and not on the clerk's boilerplate notice form
thereof (RApp12).

# Maravelias Defense Against False, Perjurious Stalking Order Petition

## January 5th, 2017

## Paul J. Maravelias

34 Mockingbird Hill Rd, Windham, New Hampshire 03087

I. <u>Material falsehoods</u> in plaintiff's report (i.e., relevant to accusation of Stalking as defined in RSA 633:3)
   i. Abhorrent, perversely mendacious claim of "insistent", bullying tone on 12/12/16 and perjurious contrivance of dreamed-up "learn to love me" quote
      1. **Quote: "My mom + me told him that he should leave + take the car with him. He insisted that we go to dinner with him and that I would 'learn' to love him. We were scared"**
      2. Utterly, categorically false. This unfathomable statement incorporates the most insidious, fantastical, and malignant act of perjury found anywhere in this whole morally revolting report, save for perhaps the "arm grabbing" contrivance alleged prior. The patently false and infuriating mendacity that Paul "insisted" on their certain actions, or ever uttered the words "learn [to love me]" shall go uncontestably documented as raw criminal falsification of an official document, criminal defamation, and **class B felony perjury** – when Paul produces an audio recording of this very exchange which he made for tragically different intentions than defending himself from a false accusation of stalking by a liar who has abandoned the most basic standards of law abiding, Christian morality by bearing false witness against a neighbor in a malevolent, vindictive attempt to injure someone who is innocent, and who has always been so patient, respectful, and longsuffering out of loving care for her.
      3. **Paul shall produce, if necessary, an audio recording which clearly demonstrates the wholly gentlemanly, friendly, and chivalrous way in which he declared his feelings to the plaintiff on 12/12/16.** The recording also clearly documents the sweet, kind, and beautiful voice and personality of the plaintiff, and her mother, in her appreciative receipt of Paul's display, and firmly confident rejection. The recording uncontrovertibly exposes the sweetness of the plaintiff's and her mother's personality, and the gentle kindness of Paul's statements, and therefore reveals the treacherous and interpersonally betraying abdication of honesty out of which the plaintiff's intent lie in this part was concocted – alleging falsely that she and her mother seemed "scared", that Paul had acted abusively, and had reason to leave earlier than he did by their reaction. The recording proves otherwise.
      4. Neither the plaintiff nor her mother asked Paul to leave. Paul left once non-verbal social cues indicated that a satisfactory and conclusive end had come to a very

dignified, honorable, and bi-directional exchange of feelings, in which Paul affirmed to the plaintiff in plain English that he "respect[ed] [her] feelings" and would simply remain a friend lest her feelings were ever to change in the future.

5. After seeing on December 28th the disgusting abuses of truth which the plaintiff has waged to injure innocent Paul in the quote above and in others, Paul's affection has been damaged. However, he still loves the plaintiff at least on a basic level of Christian charity. Therefore, recognizing that the plaintiff could go to juvenile prison and/or face severe criminal consequences for such outright and documented perjury, he may be willing not to press charges nor incite criminal prosecution for perjury provided that the unjust protective order not be issued, despite the unwarranted and unexplainable mental anguish her criminal action caused him on and since December 28th, 2016 (and not a day prior).

6. The plaintiff did not paraphrase but rather **explicitly quoted** the word "learn" to create the ominous, bullying image of a wayward stalker who would insist something as creepy as the aggressive statement "well, you will learn to love me!" Since the memory was so recent for the plaintiff (16 days prior to report), and since she was so specific about this intent, malignant falsehood, the clear and convincing audio recording evidence will be absolutely sufficient for the District Attorney to issue an arrest warrant for the plaintiff, and for Paul to sue the plaintiff, and also the plaintiff's parents for perjury, who are also liable in this setting by virtue of their guardianship. **This evidence further strengthens Paul's civil cause of action for a separate lawsuit against David D. for Harassment and, more importantly, Abuse of Process.**

7. A defense in criminal court by the plaintiff of "I forgot precisely what he said; my apologies" would certainly not be sufficient to avoid legal punishments, since she directly quoted a word as part of a phrase which Paul did not ever say, swore under oath that the information contained was accurate, and faces a clearly audible audio recording proving her statement was a false contrivance.

8. Furthermore, Paul's audio recording proving the plaintiff's perjury is fully admissible evidence under RSA 173-B:3, VIII

ii. Lies purporting "demanded" social interaction on 6/18/15

    1. Quote: **"Things were quiet with him until my 8th (6/18/15) grade graduation where he followed me + demanded that I take pictures with me [sic] + wanted to hug me"**

        a. The negligent carelessness of this abusive distortion of truth fittingly concords with the plaintiff's inattention to forming a sensible sentence, obviously intending to say "demanded that I take pictures with *him*" – a completely false and dishonestly portrayed recoloring of what was in fact a casual and friendly "congratulations … picture?" comment delivered by Paul, completely appropriate to the setting, next to Paul's mother when she herself was taking a picture of the plaintiff and someone together.

        b. Unlike her mentally challenged and morally corrupt father, the plaintiff is known overall to be an intelligent and verbally capable young woman. Therefore, her careless and nonsensical error in this statement evidences the overall carelessness and lack of trustworthiness which this entire document embodies, even aside from the shameful areas of outright intentional slander which permeate its contents.

c. When the plaintiff responded to Paul's friendly invitation with an excuse about needing to leave, she evinced through non-verbal cues the semblance of not wanting to interact, and Paul perceived this. Paul was very confused but dutifully did not re-approach the plaintiff at that ceremony, since he did not feel wanted or welcomed by her then. **Paul then, in an act of pious chivalry, respect for plaintiff, and commitment to self-improvement, abandoned the plaintiff altogether for another 1.5 years, allowing her to mature and hopefully restore the social friendship they had shared.**

d. Fact: Paul took intentional actions later in December 2015 and June 2016 **to avoid being seen by the plaintiff, for the above purpose.**

e. Fact: This was the first time ever that the plaintiff had demonstrated to Paul perceptible verbal or non-verbal cues that a friendly social contact was not received in a friendly fashion.

f. Fact: The plaintiff had eagerly approached Paul at his own high-school graduation and procured her mother to take a picture of her and Paul on June 14th, 2013. Paul's equal and parallel kind comment of graduation congratulations and offer for picture were socially appropriate reciprocations of her same exact extension to Paul two years and four days prior.

iii. Fantastical contrivance of the most pernicious and shameful order, of "arm grabbing" on 12/3/13

1. Quote: **"Paul then came to my cheer practice the next day, <u>grabbed my arm</u> and wanted to talk about my feelings"** (Emphasis added)

2. Paul theorizes that without a seemingly credible allegation of physical violence, this protective order application would have sounded as laughable and inviable as it justly is. The plaintiff therefore criminally fabricated this heinous contrivance of "arm grabbing" – a veritable act of assault and battery – which indeed was not ever committed, **nor even once formerly alleged to have happened, even throughout the extensive discussion Paul had with plaintiff's parents** about the December 2013 social misunderstanding a few days later. Paul had been procured by his mother to drop off his sister at Windham Center School for cheer practice, and was on the premises for a separate, legitimate purpose. Having learned that he had acted awkwardly to plaintiff, in her perceptions, a few days prior, and knowing she was there, Paul gentlemanly offered a smiling, passing apology statement to the plaintiff as she entered the building. **There was not the slightest manifestation of physical contact, as her and her parents' utterly taciturn failure ever to make this allegation beforehand proves.** Had this "arm grabbing" actually happened, the plaintiff's father surely would have complained to police for physical assault, and would have bitterly scorned Paul for physically abusing the plaintiff, instead of gracefully inviting him over to speak about the misunderstanding in a non-confrontational way on 12/6/13.

3. Furthermore, the plaintiff's unscrupulous perjury in alleging Paul "grabbed [her] arm" goes undeniably exposed by her own inconsistency about Paul's history of violence in this report. At the end of the document, she checked "unknown" for "history of violence or violent tendencies". This absolutely contradicts her shameful and willfully malignant claim that Paul "grabbed her arm" (a veritable act of violence and physical aggression) on 12/3/13.

    4.   This insidious lie alleged by the plaintiff is consistent with the way she mendaciously misrepresented the respectful and chivalrous way Paul treated her on 12/12/16 in person, later in the report.

**iv.** **"Late November at the Turkey Trot [2013] in Windham, Paul showed up and tried to walk with me. This was unwanted behavior and scared me."**

    1.   This is a fantastical rewriting of history which in fact never occurred. Paul was standing in a stationary position amid a group of socializing outdoor Windhamites, and the plaintiff walked up to and approached Paul, accompanied by Paul's sister. This was actually video recorded by a family member of Paul (for entertainment purposes only), and the plaintiff's claim that the brief conversation was "unwanted" may go shockingly disproven by the production of this video. The casual conversation with the plaintiff lasted for a few minutes, and afterwards she went on to walk the course with Paul's sister and to socialize with other people.

**v.** **"Shortly thereafter Paul hacked into my personal social media account and read my private message about my feelings of Paul stalking me and being creepy."**

    1.   This shocking and **perversely outrageous fallacy** was fully known to be as such by the plaintiff's parents, and therefore produces strong evidence that willful perjury was committed by the plaintiff, and unquestioned proof that David D. (having seen and procured her report) is liable for prosecution on the grounds of Subornation of Perjury. Laurie D. stated verbatim to Paul during a chat on 12/6/13 about the awkward social misunderstanding that had happened, "I don't know how to tell you this without sounding rude, but I almost wish you had hacked into her account, since it would be easier for [plaintiff] to process that over her friend leaking information" (for clarification, her "friend" is Paul's sister and was actually reprimanding Paul when disclosing the nature of her Twitter statement, since it suggested Paul had "acted awkwardly", for which he apologized). Dave D. immediately said thereafter, "I'm actually happy it played-out the way it did since, if you had actually hacked into her account, we wouldn't be sitting here having this conversation". Paul recalls these words with crystal-clear accuracy and **the dramatic conspiracy theory that he had "hacked" into any accounts had been completely and thoroughly debunked**, at the very admission of the plaintiff's parents. Hacking into someone's account (aside from its absurd impossibility) is one of the strategic, thematic images which the plaintiff dishonestly employs to dramatize and cast Paul as some sort of feared, stalking adversary against whom a protective order could be taken.

**vi.** **"His parents were apauled [sic] and told him that Paul had psychological issues."**

    1.   **Paul's parents absolutely never, in any way, offered an original suggestion that Paul "had psychological issues".** Paul's parents specifically discussed with Paul on 12/14 the frightening absurdity of David D.'s delusional self-assurance that Paul "had psychological issues" and was "violent", which were two allegations that in every way had been originated **by David and not by Paul's parents**. In private conversation, Paul's parent called David a "lunatic" for making such allegations and with such remarkable confidence.

    2.   David's laughable allegation that Paul "has psychological issues" is a phenomenon called "projection" in psychology. This refers to a subconscious defense mechanism in which **an insecure person "projects" their very own impulses or qualities onto someone else, in order to fortify their own sense of worth, sanity, or rectitude about which they have unexpressed self-doubts.** In his case, David's subconscious

projections likely align with the overall reasons for his insane and vengeful, conflict-sowing behavior in procuring the plaintiff to fill out this protective order request, and are primarily: 1) insecurity as a father by being perceived by many peers and friends, whether he is positively aware of such gossip or not,  as the prime causer of his eldest son Nicolas's recent fall into homosexual identity, occultist involvement, and drug abuse, by failing to have a normal father-son relationship to reinforce the presence of a masculine gender role critical to healthy psychosexual development, and 2) insecurity as a father for his daughter, the plaintiff, since her safety has twice been actually threatened by a legitimate cause: he having shamefully done absolutely nothing of note to care to either situation (in 5th or early 6th Grade she was driven around on a dangerous boat by a drunken father of her friend while at a birthday party, and David did not take action, and this past October she suffered an incident of criminal trespassing and *actual* stalking when someone threw rocks at night towards her window, and coward David likewise did nothing other than running to the police like a powerless, incapable cry-baby, much like his action on December 23rd when he was angered by a firm text message from Paul commanding him to stop inappropriately harassing Paul's father during Christmastime).

3. Paul has worked for three years with multiple counselors and student-serving professional psychologists as part of his employment as a Resident Advisor within Dartmouth College dormitories. Paul would not have been accepted to this demanding job three years in a row had he exhibited the most remote signs of a psychological disorder himself. Last year, Paul worked as a peer mentor for other RAs to fine tune their skills for a particular intervention and counseling model called Motivational Interviewing which RAs implement when helping residents through personal struggles. Dartmouth places very high standards of adequacy for this trusted role and Paul's continued success in it illuminates the absurdity of the attacks on his sanity, when in fact he is a trusted member of his college residential community.

II.    Immaterial Falsehoods

    i.    **"…to get him psychiatric help to no avail."**

        1.    False. Paul and his parents, after discussing amongst themselves the reality of David D.'s aggravated lunacy, **decided on 12/14 to placate his gas-lighting and disturbing insistence that Paul "seek professional counseling help"** when indeed the latter is of sound mind. Paul and parents feigned a cowering response to David and promised this would happen. The plaintiff made the above risible claim a mere 14 days thereafter during the Christmas season and when Paul was away from school (counseling resources), and so her perceived non-satisfaction of even his strategic agreement is absurd and follows from absolutely no factual denial or change in the promise whatsoever. It does, however, establish the manipulative and domineering arrogance of plaintiff and her father, demonstrating willingness to wave threat of protective-order-seeking over Paul's head (Abuse of Process), and then failing even to honor the agreement. In a war context, this is called "perfidy" and is condemned by the Geneva Convention, since it is indicative of the same absolute moral baselessness and turpitude which permeates David D.'s repulsive behavior.

    ii.    **"The incidents started in 2011".**

        1.    This is an absolute lie which the plaintiff herself contradicts in the following sentences, describing a high-school graduation party which occurred on Saturday June 29th, 2013 as the time of the "first incident".

iii. **Claim of discomfort by Paul's friendly and complimentary chatting on June 29th, 2013 at his graduation party which plaintiff attended**
   1. **Fact: Paul never expressed romantic interest in plaintiff until December 12th, 2016 (3.5 years later).**
   2. Fact: The plaintiff voluntarily socialized with Paul numerous times in summer 2013 after the alleged "discomforting" comment, and gave absolutely no indication whatsoever of having been made to feel uncomfortable.
   3. Additional fact: On 12/6/13, Laurie D. stated to Paul "in the past [plaintiff] has always really appreciated the social attention you've given her".
   4. Additional fact: On 11/30/13, David D. asked Paul as a trusted friend to drive plaintiff back to her house from a restaurant, indicating the trusting friendship shared by all parties and absolute absurdity of plaintiff's claims up to this point in her sickeningly dishonest report.
   5. Fact: Never before this embellished and factually repulsive report was this specific claim about June 2013 ever mentioned to Paul, even when plaintiff's parents had a conversation with him about the December 2013 social misunderstanding.

iv. **"He had made unwanted contact and advances at which time my dad asked him to stop".**
   1. This is a palpable absurdity, given the 2011 – June 2013 temporal setting which the plaintiff maliciously establishes for this accusation. David D. never conversed with Paul about anything relating to plaintiff until December 2013, when the content even then indeed had nothing to do with unwanted "advances" but instead was about clearing up a social misunderstanding which unfairly (and briefly) placed Paul in the lens of interpersonal hostility. The worst accusation alleged against Paul at that time was of "having acted awkwardly", not having made **"advances", which is a disgusting and thoroughly outrageous word for the plaintiff to have used in this context** and in the light of her wholly platonic 12-year-old girl friendship with Paul at this time.

v. **"12/1/13 – We had a Catholic confirmation party at our home and his family was invited. He came into my bedroom uninvited"**
   1. The plaintiff's younger and playful brother, Michael, was asking Paul to come upstairs and play videogames together. Michael brought Paul upstairs and engaged in a short episode of friendly and playful conduct among Paul, his sister, the plaintiff, and another guest, during which Michael did lead Paul into the plaintiff's bedroom, and whereupon Paul made some joke or something about a poster on the wall. This was perceived as awkward by the plaintiff, and was the origin of the **"social misunderstanding" of December 2013 which animates many of the plaintiff's absolutely contrived, outright-false accusations in the first half of her report, despite having been entirely settled content for years, never perceived by anyone in the most extravagant imaginations to be modern sources of awkwardness or discomfort (as evidenced by plaintiff's and/or family's subsequently voluntary presence with Paul, as recently as 6/18/16 at his house (plaintiff any family) and as soon after as 12/23/13 also at his house (plaintiff only with two friends)).**
   2. In December 2013, Paul felt bad for coming off as awkward (and was probably perceived that way, and rightly so, for having gained a lot of weight since the prior summer). Paul apologized a few days later for acting awkward. Coming off as socially awkward at times is a reality of life which virtually all experience at some

point and could not lay further from the legal definition of "Stalking", for which RSA 633:3 clearly mandates a credible "fear for personal safety".

vi.   **"Paul showed up at a cheer fund raiser ('canning') along with his sister to give $100 to me".**

1.   False. Paul appeared in conjunction with getting lunch at Mary Ann's Diner with two of his high-school friends and did indeed donate $100 to the cheer team which his sister and friend (the plaintiff) were on. This was not an individual cash gift to plaintiff, as is misleadingly claimed by her words "to me".

vii.  **"He then drove his sister and me home but tried to drop off Debbie first so he could be alone with me and that made me scared."**

1.   False. Paul asked "who" he was dropping off first, and then deferred in every instance to the preference of his passenger. "Tried" is a misleading and false term which would only be justified if he had actually navigated the vehicle in a way as to prolong contact with the plaintiff, **which he did not.** Google phone location history records may be consulted to document the right turn onto Jenny's Hill Rd to drop off plaintiff per her request, before returning to his house. She did not exhibit any non-verbal cues of feeling scared and indeed kindly offered and remembered to restore to Paul a skateboard-like toy which she had borrowed from him over the summer immediately upon arrival at her house – strange behavior for someone who should have felt "scared", according to this report.

2.   The plaintiff's unwarranted reconstruction of history must also be corrected for the inaccurate light in which it paints the friendly acquaintance relationship which Paul and the plaintiff shared at this point (i.e., not at all one of expressed unwanted contact). Indeed the plaintiff had voluntarily elected to be "alone" with Paul (insofar as that term may be used to describe two platonic friends, one of whom was 17 and the other 12) for the first time many months prior on April 8th, 2013 when she joined Paul socially to meander the Windham High School halls and casually chat during a musical performance at the school for his sister. **The revisionist history of her report and its rephrasing an innocent, consensual friendship into an ominous tone is therefore deeply disturbing and entirely inaccurate.**

viii. **"On 12/4/13, my parents asked Paul to come to the house so they could tell him to stop harassing me and how disgusting it is for him to make advances to a 12 year old girl."**

1.   This ostentatious corruption of historical fact perverts the true nature of the reasons for the meeting held on 12/6/13 with Paul and plaintiff's parents: to clear up some social misunderstandings following from his perceived "awkward" behavior, misunderstandings which were aggravated by the respectful apology letter he wrote thereafter. **It is positively disgusting that the plaintiff has stated Paul made "advances" to her at this time, and absolutely false.** Let the unarguable truth be known that Paul never expressed romantic attraction to plaintiff (that in itself hardly an "advance", as this word so callously and infuriatingly endeavors to misrepresent Paul's gentlemanly and respectful comportment) until 12/12/16, more than three years later.

2.   The plaintiff provides an incorrect date for the invitation for the meeting and the meeting itself, which was in fact on 12/6/2013. This error is consistent with the other inaccuracies and perversions of truth encountered throughout the plaintiff's embellished and, at times, positively perjurious report.

ix. **"At this point, my father contacted his parents + Paul again to tell him not to contact or approach me again."** (In reference to 6/18/15)

1. This is a flamboyant, enraging falsehood. David D. contacted <u>only</u> Paul's parents in June 2015, and in a sickening twist of mentally abusive and cowardly negligence, did not once endeavor to contact Paul directly. He in fact expressly indicated to Paul's parents he did not want to hear from or talk to Paul then. This was the beginning of Dave D.'s history of cowardice, delusions, and unexplainable behavior.

2. Dave D. communicated that the plaintiff had felt uncomfortable when Paul said congratulations and offered to take a picture together. He did not deliver any commandment whatsoever to Paul about future contact. Also, the plaintiff's reactions to Paul's kind and casual comment were not becoming of any reasonable person. **Paul did keenly and appropriately avoid the plaintiff for well over a year thereafter, whereupon and during which time she on her own accord came to Paul's residence exactly one year later (on 6/18/16) and betokened the restoration of normal feelings of friendship.**

3. Furthermore, the plaintiff's initial usage of the word "again" in the quoted section seems to insinuate that David D. had told Paul not to "contact or approach" the plaintiff prior to this date, when in fact David never said that until his verbally abusive explosions over the phone just last month in December 2016. David D. had specifically stated to Paul on 12/6/13, in reference to the social misunderstanding that occurred, "I just want everyone to be comfortable... for instance, if we're at a family gathering, and [plaintiff] is there ... just don't be awkward and act normal... she's a family friend". His tone in that conversation had been of restoring normalcy to the severe confusion which had surrounded Paul in a social context, not ever of perceiving "unwanted" romantic gestures and of insisting all forms of social contact were unwanted. Such a bitter and extreme rejection came only over the phone when David D. exploded into a fit of unprovoked, disgraceful rage against Paul separately on the evening of 12/12/16 and again on 12/14/16.

x. **"Paul had also joined Anytime Fitness Gym in Windham to try to talk to my father to 'buddy up' with him. My father had to quit the gym."**

1. Of all the plaintiff's bitter assaults against truthful honesty among her statements immaterial to the subject matter of stalking, this one may serve as the absolute finest caricature of the plaintiff and **her neurotic family's hysterical and psychotic propensity to assign malicious meanings to innocent acts, to misconstrue Paul's normal and gentlemanly actions in the light of a socially inept reject, and to criminalize Paul's laudable actions** by perverting true facts. The positively insane, hyperactive absurdity of the quoted two sentences may otherwise provide a fine opportunity for humor and entertainment, were they not joined into such an unsettling and vile corruption of truth directed towards the intent injury of an innocent person.

2. Fact: Paul had in reality joined Anytime Fitness **years before in March of 2013**, and regularly attended thereafter when in Windham.

3. Fact: Paul never saw David D. at the gym until the morning of Saturday, June 14th 2014, in Paul's second year of gym attendance.

4. Paul recalls that a majority of the mere three or four times he saw David at the gym, that he had already been there himself working out, and that David entered thereafter.

5. This risible and ludicrous pericope of the plaintiff's report, though immaterial, is absolutely essential for appreciating some disturbing facts. As this has nothing to do

with the plaintiff or allegations of stalking of her own self, why is it here? This shows nothing but the disturbing and influential presence which David D. somehow has wielded throughout this report, in accordance with Paul's documentation that he himself procured the plaintiff to write this report, and is therefore liable for felony Subornation of Perjury. Furthermore, the neurotic hypersensitivity and confusing inconsistency of the plaintiff's family's actions is elucidated by the revelation that David D. "quit" the gym since he had seen Paul there a few times.

    a. Fact: David was friendly and outgoing to Paul, if ever they exchanged a few passing and rare comments at the gym, indicating a very different picture of their relationship than the plaintiff paints.

    b. Fact: If David did not quit the gym because of Paul's presence, then this is yet another lie in the report. If he did, it is another testament to his palpable insanity and overwhelming insecurity.

xi. **"He said that he would … not stop pursueing [sic] me."**

    1. This is yet another concerning fallacy which intimates the existence of an extremely inappropriate role of David D. in suborning and causing this protective order to be requested at the behest of his own vengeful will, rather than out of legitimate concern for safety and initiated by the plaintiff. The word "pursuing" was the distinctive, **choice terminology of David D. in his psychotic outburst of reprehensible vitriol at Paul over the phone**, and Paul was frustrated at his usage of such a negative, criminalizing word. "Pursuit" is a word which connotes active aggression to acquire an end which is fleeing and does not want to be "chased" – completely consistent with the plaintiff's unjustified and verbally abusive mischaracterization of **Paul's honorable and gentlemanly behaviors as a friend only, for four years, and as a potential romantic partner, for about 2.5 minutes on December 12th, 2016 before the plaintiff rejected Paul's offer, whereupon Paul respectfully accepted her feelings.** David is guilty of **gas-lighting and psychologically terrorizing** Paul on the phone by claiming a right to Paul's feelings and insisting Paul no longer have feelings of love (and by extension, adoration, compassion, attention in prayer, and self-sacrifice) for the plaintiff. **Paul never cowered to Dave's bullying** by adopting the disgraceful term "pursuing", which Dave barbarically used to describe the full history of Paul's honorable affection, even mere hours after he had suffered a bitter romantic rejection and maintained such a level-headed and gentlemanly character throughout the interaction.

xii. **"My dad firmly told him to never contact me or our family again. He has not complied so my dad went to the Police."**

    1. **Fact: Paul Maravelias is entitled to free speech as a natural right and under the First Amendment of the U.S. Constitution, and in no case will he bow-down in submission to the petulant, cowardly, and shamefully insecure whining of David D.** – the head of his own household – that Paul should not contact him, especially as he continued to contact Paul's parents in a sickening and warped counteroffensive of circumventive stalking and harassment of Paul by delivering baseless legal threats indirectly through his parents.

    2. **Fact: Paul never contacted the plaintiff after December 12th, 2016, and this is the <u>only</u> relevant fact, since she is the plaintiff of the protective order request.**

    3. Fact: Paul never contacted the plaintiff's family, other than David D. who was harassing Paul and who initiated contact, after December 12th.

4. Fact: David D. never firmly told Paul never to contact him again. He stated in a text "please do not contact me or my family ever again", in a characteristically gas-lighting assertion of a defensive, peaceful position, when in reality David had initiated contact with both Paul and Paul's father to verbally batter both of them. David's disingenuous attempt to repair his reputation by composing a calm text message is inherent to the behaviors of sociopathic verbal abuse as a whole, in that it attempts to persuade the victim of the abuser's innocence. **Paul had and still has absolutely zero respect for David's shamefully pusillanimous request that he not contact him, given the verbal abuse and bullying David had waged against him unprovoked, and by making infuriating (and false) statements with no factual basis though speaking them with a voice of such reprehensible certainty.** Three examples of the latter were 1) David's audaciously ignorant assertion that Paul's sister was "intentionally lying" to him when delivering her honest thoughts about the viability of Paul's gift and romantic overture on 12/12/16, 2) David's sick and borderline-incestuous canard that Paul had chosen the date due to the NH legal age of sexual consent, and 3) David's contemptible drivel undermining the quality of Paul's treatment of his mother: an inciting act of verbal harassment on which he had no factual basis to validate, when challenged.

5. Fact: David D. only "firmly" told Paul not to contact his family while speaking to Paul on the phone, and Paul indicated that no normal person would think it reputable to contact immediately the woman who just delivered a romantic rejection to that person, and that he had no plans of exercising his full right to contact absolutely whomever he pleases in the case of the plaintiff.

6. **Paul Maravelias claims a God-given right to free speech and shall show markedly less mercy in counteroffensive prosecution against the despicable father of the plaintiff and potentially against her own morally challenged self, due to the pernicious and arrogant assertion that Paul was ever bound to the psychotic, arbitrary dictates of the spineless crazy-man David D. – a supreme fool, an active sower of discord, and a pathological liar (as he promised he would not "take [causeless] legal action", being given the assurances he received from Paul and parents).**

7. The non-compliance mentioned in this quote has absolutely nothing to do with contacting the plaintiff, which occurred never after 12/12/16. It refers to a text message Paul sent to David D. on 12/23/16, after Paul learned David was still harassing his father while at work and resuscitating his formerly settled threat to pursue (frivolous) legal action against Paul.

8. Even the temporary protective order issued imposed no restraint on Paul from contacting the members of the plaintiff's family, and it is observed that David's insecure cowardice in his reaction to Paul's text has backfired in its evident proving David's crime of Abuse of Process: this request for protective order was engendered by his own admission as a retaliatory mechanism for perceived non-compliance with his despotic, perverted imposition of authority over Paul's free speech rights, rather than as a legitimate attempt for protection initiated by the plaintiff in a legitimate matter of safety.

xiii. **"Paul said that he would comply but would like to communicated [sic] through mail. The police officer was disturbed and suggested a protective order."**

1. The plaintiff has abused her ability to put whatever words she pleases both into Paul's mouth and into the police officer's mouth without any standard of verification incumbent upon her. **Paul never acquiesced the slighted concession of his free speech rights to contact absolutely whomever he whims to contact.** He merely asked the officer about the content and extent of David D.'s laughably childish contact with him that night, which served (again) **no other purpose than a vindictive and immature display of will** (David D. had already himself ordered Paul not to appear on his property, and Paul enthusiastically agreed, informing David that he did have a right to issue that command to him, much unlike the farcical air of authority he attached to the mere request that Paul not exercise his full rights to contact whomever). Therefore David's procurement of police clarification for no-trespassing was entirely gratuitous. Paul himself described that this David individual was threatening a protective order on vindictive grounds and that David had been harassing him and his family for weeks. The officer, in fact, was disturbed to hear about David's behavior.

2. **It is remarkable and noteworthy that the plaintiff intently introduces the willfully misleading notion that the idea of a protective order originated from this officer,** which of course is a documented and laughable absurdity similar in nature to the ones made against Paul in misrepresenting what was his respectful and kind course of conduct. David had hung the threat of seeking a protective order over Paul and over Paul's parents in his irrational, senseless verbal battering of Paul's father and of Paul on 12/12 and 12/14. Paul's parents met with David on 12/14 for the very purpose of placating his insanity to drop the frivolous threat, which he did at that time, before perfidiously renewing the same threats on 12/23 to Paul's father, unprovoked, in a shameful display of dishonesty. It is therefore patently false and criminally misleading, the assertion that a protective order was an idea originated by the officer. It was indeed a willfully premeditated course of revenge to satisfy David's lust for self-validation amid the psychological issues as a parent he has had in recent times, and his profoundly insecure sensitivities which were awoken by Paul's prefacing his expression of love with a lavish gift on 12/12. The fact that the plaintiff – or whoever wrote this illegal report – has gone out of their way to offer some sort of alternate explanatory mechanism for the strange circumstances in which this order request was finally issued (a whopping 16 days after the alleged unwanted contact) strongly indicates that the plaintiff and/or her wretched father are malignantly conscious of their Abuse of Process in having discussed the protective order as an objective bargaining chip in his games of intimidation and psychological terrorism against Paul, in order to brow-beat Paul into performing the belittling task an offended David insisted. This noteworthy (and, of course, willfully false) segment about the protective order supposedly originating from the "officer" underscores therefore the clear criminal culpability of the plaintiff's father David in suborning this perjurious report for vindictive purposes only.

# THE STATE OF NEW HAMPSHIRE
## JUDICIAL BRANCH
NH CIRCUIT COURT

10th Circuit - District Division - Derry
10 Courthouse Lane
Derry NH  03038

Telephone: 1-855-212-1234
TTY/TDD Relay: (800) 735-2964
http://www.courts.state.nh.us

November 16, 2018

**PAUL MARAVELIAS**
**34 MOCKINGBIRD HILL RD**
**WINDHAM NH  03087**

Case Name:     **Christina DePamphilis v. Paul Maravelias**
Case Number:   **473-2016-CV-00124**

Motion to Set Aside Judgement

November 16, 2018
Date

Robin E. Pinelle
Clerk of Court

(697)
C: Simon Robert Brown, ESQ

# THE STATE OF NEW HAMPSHIRE
## JUDICIAL BRANCH
### NH CIRCUIT COURT

10th Circuit - District Division - Derry
10 Courthouse Lane
Derry NH  03038

Telephone: 1-855-212-1234
TTY/TDD Relay: (800) 735-2964
http://www.courts.state.nh.us

## NOTICE OF DECISION

CHRISTINA DEPAMPHILIS
10 C▮▮▮▮▮▮▮
WINDHAM NH  03087

V.  PAUL
     MARAVELIAS

34 MOCKINGBIRD HILL RD
WINDHAM NH  03087

Case Name:     **Christina DePamphilis v. Paul Maravelias**
Case Number:   **473-2016-CV-00124**

Please be advised that on November 16, 2018 the Court made the following Order:

**Upon consideration of the Motion to Set Aside Judgement, the
Court finds no legal and factual basis upon which the Court
may grant relief.  Motion to set aside Judgment is Denied.**

November 16, 2018

/s/ John J. Coughlin
Name of Judge

(697)

RPPP 13

Robin E. Pinelle, Circuit Clerk
NH Circuit Court
10th Circuit – District Division – Derry
10 Courthouse Lane
Derry, NH 03038

November 21st, 2018

Paul Maravelias
34 Mockingbird Hill Rd
Windham, NH 03087

**RE: Christina DePamphilis vs. Paul Maravelias
Docket No. 473-2016-CV-00124**

Dear Clerk Pinelle,

Enclosed please find Respondent's *Motion for Recusal and Reconsideration* to be filed in the above-referenced case.

Thank you for your attention to this matter.

Sincerely,

Paul J. Maravelias

CC: Simon R. Brown, Esq.

**RApp14**                                                              **RApp14**

THE STATE OF NEW HAMPSHIRE

ROCKINGHAM, SS                          10TH CIRCUIT – DISTRICT DIVISION – DERRY

Docket No. 473-2016-CV-00124

Christina DePamphilis

v.

Paul Maravelias

## <u>**MOTION FOR RECUSAL AND RECONSIDERATION**</u>

COMES NOW Respondent Paul Maravelias and respectfully submits the within *Motion for Recusal and Reconsideration* pursuant to New Hampshire Code of Judicial Conduct Canon 1, Rule 1.2 and Canon 2, Rule 2.2 and 2.11; Circuit Court District Division Rules 1.8-A.(H) and 3.11(E); RSA 492:1; and Part I, Article 35 of the Constitution of the State of New Hampshire. In support thereof, Respondent asserts the following:

1. On 10/31/18, undersigned Respondent filed a "Motion to Set Aside Judgement" in this case identifying nine general areas in which Judge Coughlin did commit, potentially committed, or could reasonably be argued to have committed judicial misconduct in Respondent's prejudice.

2. Respondent Maravelias noted in Paragraph 6 of said Motion that he sought "redress for disturbing indications hereunder of John Coughlin's pre-retirement misconduct, being obviously unable to do so prior to Coughlin's 9/5/18 retirement."

3. In <u>431-2018-CV-113</u>, Judge Coughlin represented verbally on 7/12/18 and in a written Order dated 7/17/18 that he was retiring and would be uninvolved in further legal matters.

RApp15                                                                                         RApp15

4. Remarkably, on 11/16/18, this Court mailed the parties a written Order, denying Respondent Maravelias's Motion, <u>which was itself signed by Judge John J. Coughlin, the same judge whose alleged conduct was the factual substance of said denied Motion's merits</u>.[1]

5. Given the undeniable conflict of interest inherent to Judge Coughlin's denying a motion for relief predicated on allegations of his own prejudicial misconduct, Respondent respectfully requests that the Court appoint a new judge to read and reconsider Maravelias's 10/31/18 Motion, and that Judge Coughlin recuse himself from participating hereinafter in this case.

## I.   THE NEW HAMPSHIRE CODE OF JUDICIAL CONDUCT MANDATES THE IMMEDIATE RECUSAL OF JUDGE JOHN J. COUGHLIN

6. If Judge Coughlin's unexpected continued involvement derives from a "senior active status", he is still bound by the Judicial Code of Conduct rules applicable to part-time judges. *See* N.H. Supr. Ct. R. 38, "Application", Paragraph B. None of the part-time judge exemptions apply to the following authorizations cited for mandatory recusal in this case. *Ibid.*, Paragraph C(1).

7. The Judicial Code of Conduct, Canon 1, Rule 1.2 stipulates:

> "A judge shall act at all times in a manner that promotes public confidence in the independence, integrity, and impartiality of the judiciary, **and shall avoid impropriety and the appearance of impropriety**." (Emphasis added)

The Rules' comment thereon stipulates:

> "...The test for appearance of impropriety is whether the conduct would create in the mind of a reasonable, disinterested person fully informed of the facts a perception that the judge's ability to carry out judicial responsibilities with integrity,

---

[1] It appears that Judge Coughlin, not the Court's Clerk, criminally violated RSA 173-B:3 I. in said 11/16/18 Order by "revealing" the "whereabouts of the plaintiff", publicizing her confidential home address at the top of said decision, even though she has an active Stalking Final Order of Protection which Judge Coughlin himself extended. However, Respondent Maravelias was not prejudiced by this careless error; therefore, it is excused from further discussion in this Motion.

impartiality and competence is impaired."

8.   Judge Coughlin's 11/16/18 nondescript boilerplate rejection of Maravelias's highly specific Motion alleging Judge Coughlin's misconduct atrociously emanates the appearance of impropriety and is, in fact, improper. <u>Judge Coughlin's impartiality is undeniably compromised where the factual allegations at-hand concern his own judicial conduct</u>.

9.   Likewise, Judge Coughlin's mere judicial involvement in relation to the Motion violates Canon 2, Rule 2.2 (A), which stipulates: "A judge shall uphold and apply the law, and shall perform all duties of judicial office **fairly and impartially**." (Emphasis added)

10.    Canon 2, Rule 2.11 expressly necessitates Judge Coughlin's recusal in relation to this Court's decision on the Motion to Set Aside Judgement. Rule 2.11(A) provides as follows:

> "A judge **shall disqualify himself or herself in any proceeding in which the judge's impartiality might reasonably be questioned**, including but not limited to the following circumstances:
>
> (1) The judge has a personal bias or prejudice concerning a party or a party's lawyer, or **personal knowledge of facts that are in dispute in the proceeding.**
>
> (2) The judge knows that the judge … is
> …
> (c) **a person who has more than a de minimis interest that could be substantially affected by the proceeding**; or
> (d) **likely to be a material witness in the proceeding.**
>
> (5) The judge:
> …
> (c) **was a material witness concerning the matter."**

(Emphasis added)

11.    It lies beyond dispute that Judge Coughlin 1) is a "material witness" to his own conduct, 2) that he has "personal knowledge of facts" and circumstances of his own judicial conduct disputed within Maravelias's Motion, and 3) that Judge Coughlin has "more than a *de*

*minimis* interest" in the outcome of a proceeding which could possibly result disciplinary sanctions against him by the New Hampshire Judicial Conduct Committee.

12.     The appearance of a judge ruling on a motion in which his own alleged misconduct sustains argued grounds for relief is a horrendous spectacle of bias in the eyes of any average citizen having reasonable sensibilities, let alone cause to "reasonably question" "impartiality". Judge Coughlin exponentiated all "reasonable question" of his impartiality by writing no more than an insipid two-sentence, white-label denial addressing none of the Motion's merits at all.

13.     The urbane tonal posturing of Judge Coughlin's three-line 11/16/18 Order harkens to his prior instant-case rulings which the 10/31/18 Motion argues were prejudicially dismissive byproducts of rarefied judicial onanism, as opposed to honest applications of fact and law.

14.     A fact-pattern emerges to suggest a habit of idiosyncratic violation of Judicial Code of Conduct Canon 2, Rule 2.6, guaranteeing Respondent's right to be heard. By reflexively denying pleadings with boilerplate, nondescript judicial-fluff language even in response to the Motion to Set Aside Judgement <u>which itself analytically criticized the very same prejudicial pattern</u>, Judge Coughlin has necessitated his recusal to preserve the dignity of this Court and to uphold the integrity of the judiciary.

## II.    THE NEW HAMPSHIRE CODE OF JUDICIAL CONDUCT CANON 2, RULE 2.15 COMMANDS THAT HON. ELIZABETH M. LEONARD "TAKE APPROPRIATE ACTION"

15.     The aforecited provides:

> (C) A judge who receives information indicating a substantial likelihood that another judge has committed a violation of this Code shall take appropriate action. …

Comment: [2] A judge who does not have actual knowledge that another judge or a lawyer may have committed misconduct, but receives information indicating a substantial likelihood of such misconduct, is required to take appropriate action under paragraphs (C) and (D).

16. The law unequivocally requires Hon. Elizabeth M. Leonard, as the co-presiding judge at Derry District Division where this pleading is being filed, to take appropriate action regarding the alleged bias and/or prejudicial misconduct purported in the 10/31/18 Motion, oversee Judge Coughlin's recusal, and appoint herself or another judicial officer to read and reconsider it.

### III. JUDGE COUGHLIN'S IMMEDIATE RECUSAL IS MANDATORY UNDER RSA 492:1 AND PART I, ARTICLE 35 OF THE STATE CONSTITUTION

17. RSA 492:1 provides:

"A justice shall not sit in any case in which he has been **concerned as** party or attorney or in any appeal in which he has acted as judge in the court below, or act as attorney or be of counsel for either party or give advice in any matter pending or which may come before the court for adjudication." (Emphasis added)

18. That the 10/31/18 Motion to Set Aside Judgement "concerns" believed-to-be-retired Judge Coughlin "as party" is plain. The Motion alleged an almost-year-long sustained pattern of unlawful, biased conduct which, if proven, could result in JCC disciplinary penalties. The motion rendered John Coughlin, though not a named litigating party in the provenant stalking case, "concerned as a party" narrowly to the misconduct-complaint Motion, on which he ruled.

19. Part I, Article 35 of the New Hampshire Constitution states:

"It is essential to the preservation of the rights of every individual, his life, liberty, property, and character, that there be an impartial interpretation of the laws, and administration of justice. It is the right of every citizen to be tried by judges as impartial as the lot of humanity will admit. …"

5

**RApp19**

**RApp19**

20.     In ethically ruling upon a Motion requesting certain relief warranted by a judge's objectively demonstrable course of biased, dishonest, and dismissive conduct, the populous "lot of humanity" grants ample existence of judicial officers to serve as such arbiters <u>who are not themselves the concerned party in the judicial misconduct allegation</u>. Judge Coughlin's 11/16/18 two-sentence ruling on a serious complaint of his own alleged misconduct forms a preposterous travesty of justice, transgressive of constitutional provision and contumelious to the Court's ethical dignity.

## IV.     A NEW JUDGE MUST EXAMINE AND RECONSIDER MARAVELIAS'S 10/31/18 MOTION TO SET ASIDE JUDGEMENT

21.     Since Maravelias trusted Judge Coughlin's indications of 9/5/18 retirement were accurate, he never motioned for Coughlin's recusal prior to the 10/31/18 Motion to Set Aside Judgement. Accordingly, this Court should rule-anew on that Motion with fresh, unbiased eyes.

22.     However, assuming that Judge Coughlin's 11/16/18 ruling was valid, Respondent here moves for post-recusal reconsideration thereof pursuant to Circuit Court District Division Rule 3.11(E). All "points of fact or law" advanced in the 10/31/18 Motion were comprehensively "overlooked or misapprehended" by Judge Coughlin in his steadfast judicial typhlosis.

23.     Further, Respondent addresses and corrects the flawed counterarguments proposed in Petitioner's 11/15/18 Objection to Respondent's Motion to Set Aside Judgement.

24.     Petitioner lodges not a modicum of specific objection to the actual merits of Maravelias's 10/31/18 Motion; rather, she unoriginally attacks the timeliness of said Motion.

**RApp20**                                                                                    **RApp20**

25.     Maravelias's 10/31/18 Motion was not untimely, being subject to no time limit. Petitioner cites Rule 3.11, *ibid.*, presumably at (E), which controls solely motions for reconsideration and like post-decision motions contesting the legal correctness of said decisions.

26.     Maravelias's 10/31/18 Motion to Set Aside Judgement was not such kind of Motion, as he articulately prefaced in Paragraphs 4 and 5 thereof. The similarity in consequential relief between reversing the stalking order extension because the judge was objectively biased, prejudiced, and misconduct-committing (a Motion to Set Aside Judgement) and granting the same relief because a fair judge overlooked or misapprehended errors of facts or law (a Motion for Reconsideration, subject to 10-day time limit) does not render the latter a form of the former. They are distinct types of motion. Rule 3.11(E) is inapplicable to Respondent's 10/31/18 Motion.

27.     Petitioner's futile argument essentially reduces to a delusional interpretation of the Court rules wherein a party's access to the Court system becomes categorically revoked ten days after the Court renders any initial decision in a case – *i.e.*, that parties at that time forfeit all ability whatsoever to file any motions in an ongoing case where oppressive injunction exists.

28.     Petitioner's argument directly contradicts statutory law in this case of a protective order, where RSA 173-B:5, VIII.(b) acknowledges a Respondent's obvious due process right to motion the Court for certain relief pertaining to said protective order at any time during the pendency thereof.[2]

---

[2] Undersigned Respondent has never filed any untimely motion in any case, contrary to Petitioner's threadbare accusation to the contrary. If Petitioner were correct in this regard, Judge Stephen would not have ruled on Maravelias's December 2017 motion she claims had also been "untimely". Petitioner also falsely claims in a footnote that this Court "denied" Maravelias's 3/29/18 Motion to Dismiss and Vacate Stalking Order. In reality, this Court never ruled on that Motion whatsoever.

29.     If this Court were to accept Petitioner's baseless argument that Maravelias's 10/31/18 Motion was "untimely" as filed over ten days after the prior decision in this case, then it accordingly must outlaw Petitioner's 1/5/18 Motion to Extend the Stalking Order filed 325 days after 2/14/17 notice of the immediately-prior judicial decision and therefore dissolve the same stalking order regardless.

30.     Mechanical objection is made to Petitioner's predictable, groundless prayer for attorney's fees in connection to responding to Maravelias's 10/31/18 Motion to Set Aside Judgement. Unable to accept the adversarial realities of the adversarial process, Petitioner has consummated a tiresome pattern of demanding compensation for responding to legitimate pleadings opposing her course of malicious protective order abuse against Maravelias, as she did in response to Maravelias's 3/29/18 Motion to Dismiss and Vacate, a pleading by Maravelias which similarly contained well-articulated, weighty legal arguments.

31.     As a bar-admitted attorney, Petitioner's counsel knows – or should know – that such requests for attorney's fees are only appropriate in response to frivolous conduct, not in response to compelling, necessary legal arguments. This habit of Petitioner's counsel appears to be some abstruse form of bizarre psychological autoeroticism and lacks legal validity.


WHEREFORE, for all reasons hereinabove set forth, the Respondent Paul Maravelias respectfully prays The Honorable Court:

I.      Grant this Motion;

II.     Effect the immediate recusal of Judge John J. Coughlin from all further proceedings in this case, appointing a new judicial officer to read and reconsider Maravelias's 10/31/18 *Motion to Set Aside Judgement*;

III.   Grant said 10/31/18 *Motion to Set Aside Judgement* as well as all prayers for relief contained therein; and

IV.   Deny Petitioner's 11/15/18 Objection Motion thereto.

Respectfully submitted,

PAUL J. MARAVELIAS,

*in propria persona*

November 21st, 2018

## CERTIFICATE OF SERVICE

I, Paul Maravelias, certify that a copy of the within *Motion for Recusal and Reconsideration* was forwarded on this day through USPS Certified Mail to Simon R. Brown, Esq., counsel for the Petitioner, Christina DePamphilis, P.O. Box 1318, Concord, NH, 03302-1318.

November 21st, 2018

**RApp23**                    **RApp23**